SMITH
*vs*
POLLARD, &c.

DETINUE.

*Case* 15.

# Smith *vs* Pollard, Trustee, &c.

## ERROR TO THE JEFFERSON CIRCUIT.

### *Fraudulent conveyances, &c. Devises.*

*Sept.* 18.

JUDGE BRECK delivered the opinion of the Court.

The case stated.

POLLARD recovered a judgment in an action of detinue, against Mary Smith, the plaintiff in error, for a slave by the name of Pharaoh or Faro, and $280 in damages, for his detention; and to reverse that judgment this writ of error is prosecuted.

The error mainly relied upon is, that the Court below ruled the law upon the trial erroneously, and to the prejudice of the then defendant, now plaintiff. With a view to the consideration of that question, it will be first necessary to advert to the facts as they appeared upon the trial. But without going into a detailed history of all the testimony, it will be sufficient for the object in view to say, that it conduced to establish these facts: That in 1829, Abraham Smith purchased a slave by the name of Harry, and being in embarrassed circumstances, caused the bill of sale for said slave to be made by the vendor to his father, Joseph Smith. Harry went into the possession of Abraham Smith, and so continued till the fall of 1834, when he was exchanged by him for Faro, the slave in controversy, and a bill of sale for him made to Joseph Smith, by the vendor or former owner. The slave went immediately into the possession of Abraham Smith, and so continued till his death; that in 1835, Joseph Smith died, leaving a will, in which he devised to Thomas Pollard and Thomas Smith, the slave Faro, and also a slave by the name of Isaac, in trust for the use of Abraham Smith during his life, and after his death, the slave Faro, to Pollard, in trust for Betsey Pollard, and Isaac to Smith, in trust for Fanny Johnson; that when Joseph Smith

made this will, he admitted Faro belonged to Abraham Smith, and that the provision in his will, in reference to him, was made to secure him to his son against his creditors—of this provision that Abraham was apprised when the will was made, and expressed a wish that it might be changed so as to secure the slaves to him and his wife during their joint lives and the life of the survivor. Joseph Smith expressed his willingness to make the alteration, but it was not made.

Abraham Smith was appointed and qualified as executor of his father's will, and continued in possession of the slaves till his death, in 1839—being in possession of Isaac, who belonged to his father, upon hire, when his father died. In July, 1839, shortly after the death of Abraham Smith, his widow delivered up Isaac to the Trustee, Smith—but at same time, denied the right of Pollard to Faro. In October, 1839, the will of Abraham Smith was admitted to record, and his widow, the plaintiff in error, qualified as executrix, and shortly afterwards sold Faro to Moses Black, in discharge of a debt which he held upon the testator, Abraham Smith. The slave being dissatisfied, she subsequently re-purchased him of Black, and to effect the purchase, sold a slave which she held in her own right. It was also in proof, that it was necessary to make sale of Faro to pay the debts of Abraham Smith. The testimony conduced further to prove, that the Trustee, Pollard, made a demand of the widow of Abraham Smith, in July, 1839, of Faro, and his right to him was denied by her, and the possession not surrendered.

The testimony conducing to establish the foregoing facts, which are all we deem material at present to notice, the plaintiff moved the Court for four instructions to the jury, and defendant for twenty-six. The Court, disregarding and overruling all the instructions asked, gave, in lieu thereof, sundry instructions to the jury, and whether the instructions thus given, embrace the whole law of the case, so far as the defendant had a right to have it expounded, is the question to be considered. But without further notice of the instructions at this time, we

SMITH
*vs*
POLLARD, &c.

If a sale of a slave to A and a bill of sale to B, and B devise the slave to a Trustee for the use of A for life, remainder to C, all with the intent to delay the creditors of A, it is fraudulent as to the creditors of A, and C takes nothing by the devise.—

will state the conclusions to which we have come, as to the law of the case.

Upon the assumption that the slave in contest was the property of Abraham Smith, and that he continued in possession of him from the time he obtained him in exchange for Harry, till his death, and that afterwards he continued in the possession of the widow, executrix and creditor of said Smith, and purchaser from the executrix, till the institution of this suit, and that the bill of sale for said slave, was made to Joseph Smith with a view to secure him to Abraham Smith against his creditors, and that the devise of said slave, by Joseph Smith, was in like manner made to defraud the creditors of said Abraham, and that both the Smiths participated in these acts—we are of opinion said bill of sale and devise were fraudulent and void as to the creditors of Abraham Smith; and although Abraham Smith may have held Isaac, or both Isaac and Faro, under said devise, that such holding gave no validity to the claim of the devisee in remainder of Faro, as against the creditors of said Abraham Smith.

—And such slave will be assets in the hands of B's executor for the payment of B's debts.—

We are further of opinion, upon the foregoing assumption, that if requisite for the payment of the debts of Abraham Smith, said slave became assets in the hands of his executrix, and that she might well and lawfully appropriate him as such, in that way; and if in good faith, she sold and delivered said slave to Black, in discharge of a debt due him by Abraham Smith; that said Black, thus uniting in himself the character of creditor and purchaser, for a valuable consideration, and having also the possession, would acquire a valid title to said slave, and which he would not be estopped from setting up against the devisee in remainder under the fraudulent devise of J. Smith.

—And if the executor sell, for the payment of a debt due by B, and afterwards repurchase, he is protected by all the rights of the creditors of B.

And further, if the defendant, Mary Smith, afterwards purchased the slave of Black, that her situation would be as favorable as that of Black, and like him, that she could resist the claim of the devisee in remainder.

In support of the position that the slave would be assets in the hands of A. Smith's executrix, the case of *Bethel* vs *Stanhope*, (1 *Croke's Rep.* 810,) and also of

*Hawes* vs *Leader*, (3 *Ibid*, 270,) may be cited. In the first case a fraudulent gift of his goods had been made by the testator—after his death the defendant intermeddled with them—the donee obtained possession, and after that administration was granted to the defendant; it was held that they were assets in his hands, and he was made responsible as executor. The same principle is, in effect, recognized in the case of *Hawes* vs *Leader*.

Whether the administratrix could lawfully dispose of the slave in controversy, in discharge of the debts of the testator, without the creditor having obtained a judgment, is a question upon which we have more doubt. But we can perceive no satisfactory reason why the estate should be subjected to that expense. Besides, the right to make such a disposition of the slave is based upon the assumption that it was necessary for the payment of the debts, and that he was actually sold for that purpose, and at a full and fair price; and it further appears in support of the assumption, that a settlement was made with the executrix, by County Court Commissioners, and by the judgment of the Court, the payment of said debts sanctioned and approved.

If then the administratrix was authorized, as we think she was, to make the sale, it follows that the purchaser acquired an available title, which was subsequently vested in the defendant.

But in the view which we have thus far taken of the case, what bearing the demand, if made by the plaintiff of the defendant, of the slave would have, has not been considered.

The testimony conduced to prove a demand in July, 1839, before probate of the will, and before the defendant was qualified as executrix. If the slave had been delivered when demanded, according to the doctrine in the cases referred to, and as laid down in *Roberts on Frauds*, 592–3, and *Osborne* vs *Moss*, (7 *John. Rep.* 150,) the plaintiff, as devisee under the fraudulent devise, would have been responsible to the creditors of Abraham Smith as executor *de son tort;* and if so, as the slave has since been rightfully disposed of to content to the creditors their demands, ought the plaintiff to be entitled to more

It is not necessary that an executor shall wait for a judgment to be had against him for a debt justly due, to make valid the title of a purchaser of property sold to satisfy such debt.

Property fraudulently conveyed, is, nevertheless, assets in the hands of executors, and if appropriated to the paym't of debts, it is a good answer to the demand of the donee or devisee in an action therefor.

SMITH
*vs*
POLLARD, &C.

than nominal damages for the failure of the defendant to surrender him, and this upon the supposition that she had no right to withhold him? But we are not prepared to say that she should, on that account, be held responsible at all. It is true, in the case of *Hawes* vs *Leader*, referred to, when the donee, under a fraudulent gift from the intestate, sued the administrator for having failed to deliver, upon demand, the subject of the gift, it was held that in that case the administrator was responsible although the deed of gift was fraudulent, and although the defendant plead that the fraudulent donor was indebted to divers persons in sums exceeding the assets. But it was objected to the plea, that it did not state that the outstanding debts were due by specialty; that the debts had not been paid, and might never be paid. But in this case the debts were valid and had been discharged—whether at the time of the demand we deem unimportant. If they were subsequently discharged, and were such debts as the executrix was bound to pay, and the slave in contest was subject to their payment, we are of the opinion that such facts would relate back to the time of the demand, and would be a justification to the defendant in refusing to surrender the slave; and as was said by the Court below, that upon a demand being made, the defendant would act at her peril in withholding the property, and would be or not, justified according to circumstances.

Such being our views of the law as applicable to this case, it results that the instructions given by the Court below did not cover the whole ground, and were not such an exposition of the law as the defendant was entitled to.

It is, therefore, the opinion of the Court that the judgment herein be reversed, and the cause remanded, that a new trial may be granted and further proceedings had consistent with the principles of this opinion.

*Duncan, Pirtle and McHenry* for plaintiff: *Guthrie* for defendant.